# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DAVID MADDOX,

            Plaintiff,

    v.

LEWIS, et al.,

            Defendants.

_____/

CASE NO. 1:02-cv-5225-DLB PC

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT,
AND DIRECTING CLERK OF THE COURT
TO ENTER JUDGMENT

(Doc. 77)

I.    Order Resolving Defendants' Motion for Summary Judgment

    A.    Procedural History

        Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's second amended complaint filed on May 19, 2003, against Defendants Lewis, Robinson, Neubarth, Huang and Young ("Defendants") for acting with deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment.[1]   At the time of the events at issue in this action, Plaintiff was a state prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and was housed at Pleasant Valley State Prison ("PVSP").

        Defendants filed a motion for summary judgment on March 20, 2008.  After being directed to do so by the Court and obtaining an extension of time, Plaintiff filed an opposition on September 10, 2008.  Defendants filed a reply on September 25, 2008.

---

[1]Defendants Robinson and Young have not been served with the Amended Complaint.

1

B.     <u>Legal Standard</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id</u>. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id</u>.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id</u>. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436

1   (9th Cir. 1987).

2       In the endeavor to establish the existence of a factual dispute, the opposing party need not

3   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

4   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

5   trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the

6   pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

7   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

8   amendments).

9       In resolving the summary judgment motion, the Court examines the pleadings, depositions,

10  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).

11  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

12  inferences that may be drawn from the facts placed before the Court must be drawn in favor of the

13  opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

14  (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

15  party's obligation to produce a factual predicate from which the inference may be drawn.  Richards

16  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

17  Cir. 1987).

18      Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

19  that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole

20  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21  trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

22  ///

23  ///

24  ///

25  ///

26

27

28

C.     Underlined Facts[2]

1.     Plaintiff David Maddox alleges that his mother contacted Warden Lewis and complained of medical care to the Warden.  Warden Lewis has no recollection of any such conversation and if she had discussed Plaintiff's condition with any family members, she would have referred matters to medical staff for questioning.

2.     Warden Lewis had no responsibility for hiring, training or disciplining medical staff at PVSP.

3.     While Plaintiff alleges that he informed Warden Lewis of his serious medical need, he does not allege that he ever spoke to, corresponded with, or personally made Warden Lewis aware of any of his complaints.

4.     Plaintiff initially presented to Dr. Neubarth on April 28, 1999 with a draining wound suffered during a gun shot in 1996.  Screws were placed in his leg to support his tibia prior to his arrival at PVSP.  Dr. Neubarth immediately ordered a consult with an orthopaedist (on April 28, 1999); reviewed x-rays and noted that the screws in Plaintiff's right leg may need to be removed.

5.     Dr. Neubarth helped to obtain approval for a transfer for plaintiff to the California Men's Colony (CMC) in 2000 because the CMC facility was thought to be better able to care for plaintiff.  The transfer ultimately did not occur for reasons unknown to Dr. Neubarth.

6.     Dr. Neubarth repeatedly wrote prescriptions for medication when deemed medically necessary for Plaintiff's knee pain and possible infections.

7.     Dr. Neubarth prescribed simple analgesic balms for plaintiff following his surgery on March 14, 2001, when Dr. Maloney removed one of the two screws in Plaintiff's knee and

---

[2] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by Defendants as undisputed in compliance with Local Rule 56-260(b).  Further, Plaintiff did not tender any evidentiary objections in any other form.  FDIC v. New Hampshire Ins. Co., 953 F.2d 478, 484 (9th Cir. 1992) (evidentiary defects waived absent objection).  Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's complaint.  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit *if it is based on pleader's personal knowledge of specific facts which are admissible in evidence*).  A verified opposition to a motion for summary judgment may also be considered as an opposing affidavit for purposes of the summary judgment rule if it is based on facts within the pleader's personal knowledge.  Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

determined that the remaining screw should not be removed during the operation.

8.    Dr. Neubarth further wrote chronos for Plaintiff so that he would be able to use a cane in prison, ace bandages and for a lower bunk.

9.    Dr. Neubarth wrote orders for Plaintiff to obtain emergency treatment at the PVSP emergency clinic.

10.   Dr. Neubarth agreed to refer Plaintiff to Dr. Jeffrey Tanji, a sports medicine specialist who worked at the UC Davis Medical Center when Plaintiff's complaints of pain persisted.  Dr. Neubarth then followed the course of action suggested by Dr. Tanji after the examination.

11.   Dr. Neubarth further ensured plaintiff obtained after-care following a 2001 surgery to remove one of two screws embedded in Plaintiff's tibia.

12.   Dr. Huang first examined Plaintiff in 1999 and immediately ordered x-rays of Plaintiff's knee.

13.   Throughout the time that Dr. Huang examined Plaintiff, he prescribed medications such as Robaxin, Ibuprofen, Acetaminophen and Dicloxacillin.  All medications were for pain, except for Dicloxacillin which Dr. Huang prescribed to treat a possible infection.

14.   Dr. Huang further ordered skin cultures for Plaintiff on two occasions, x-rays at least twice, prescribed antibiotics and ointment and ordered that dressing on Plaintiff's wound be treated routinely and routinely gave him an order to return to for further care following the administration of the various medications.

15.   Dr. Huang examined Mr. Maddox on five (5) occasions between April 15, 1999 and January 13, 2000, then did not examine him again until January 3, 2001, when he ordered additional x-rays and prescribed more medication to plaintiff.

16. Plaintiff did not return to Dr. Huang's care for further treatment until March 14, 2001, the day that he was operated on by Dr. Maloney and had one of the two screws in knee removed.

17.   Dr. Huang examined Plaintiff for his postoperative care and admitted him to the CTC facility (essentially intensive care), keeping him out of the general prison population until March 16, 2001.  When he returned to the general population, Dr. Huang issued chronos for Plaintiff for the use of a cane and for an assignment to a lower bunk.

18.   Dr. Huang examined Plaintiff on nine (9) occasions following his return from surgery.  On March 28, 2001, Dr. Huang removed Plaintiff's surgical sutures.  He further prescribed Robaxin, a narcotic, for the acute pain plaintiff suffered after his surgery; Tylenol #3 (another narcotic pain medication, again for acute pain); Ibuprofen (a nonsteroidal anti-inflammatory medication); and changed his dressing when necessary following surgery.

19.   Plaintiff's surgical scars healed well and there was no evidence that the screw remaining in his knee was protruding as of May 18, 2001.  Plaintiff still experienced pain in his knee as of June 12, 2001, but such pain is not uncommon only three months after surgery.

20.   Dr. Huang therefore discharged Plaintiff from further care for his knee on May 18, 2001.  Nevertheless, Dr. Huang examined plaintiff one more time after discharging him on June 12, 2001.  At that time, plaintiff's scar was healed, he was not experiencing any swelling and his injury appeared to be healing as expected.

21.   Plaintiff's medical records reveal that his complaints of pain in his knee were also treated by other physicians at PVSP and the various providers' treatment supplemented that provided by Drs. Huang and Neubarth.

22.   During the time period in which plaintiff alleges Dr. Huang deliberately ignored Plaintiff's serious medical needs (December 13, 1999 through January 20, 2000), Dr. Huang examined plaintiff twice (on December 12, 1999 and January 13, 2000).  Dr. Huang prescribed both Acetaminophen (for pain) and Dicloxacillin (for a possible infection) for plaintiff's condition on each of these occasions.  Dr. Huang further ordered that bandages be changed for plaintiff's condition and noted that plaintiff's transfer to "CMC" (California Mens Colony) was pending.

D.   Discussion[3]

1.   Claim Against Defendant Dr. Neubarth

Plaintiff alleges that Dr. Neubarth failed to provide proper medical treatment to him in

---

[3] Plaintiff's complaint and opposition are verified and shall be treated as affidavits for purposes of the summary judgment rule where they are based on facts within Plaintiff's personal knowledge of admissible evidence, and not merely on Plaintiff's belief.  Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).

1    violation of the Eighth Amendment.  Amended Complaint, p. 4.

2        "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

3    must show 'deliberate indifference to serious medical needs.'"  Jett v. Penner, 439 F.3d 1091, 1096

4    (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).  The two part

5    test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by

6    demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or

7    the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was

8    deliberately indifferent."  Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059

9    (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th

10   Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by "a

11   purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused

12   by the indifference."  Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference may be

13   manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or

14   it may be shown by the way in which prison physicians provide medical care."  Id. (citing McGuckin

15   at 1060 (internal quotations omitted)).  Where a prisoner is alleging a delay in receiving medical

16   treatment, the delay must have led to further harm in order for the prisoner to make a claim of

17   deliberate indifference to serious medical needs.  McGuckin at 1060 (citing Shapely v. Nevada Bd.

18   of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

19       Defendant argues that he is entitled to summary adjudication on the claim against him

20   because he did not act with deliberate indifference to Plaintiff's medical needs.  Defendant argues

21   that he never refused to examine or treat Plaintiff, and that he never intentionally or knowingly

22   caused Plaintiff any pain, suffering or injury.  In support of his motion, Defendant submits evidence

23   that he initially saw Plaintiff on April 28, 1997 when he presented with a draining wound suffered

24   as a result of a gun shot in 1996.  UF 4.  Prior to his arrival at PVSP, orthopaedic screws were placed

25   in his leg to support his tibia.  UF 4.  Dr. Neubarth immediately ordered a consult with an

26   orthopaedist, reviewed x-rays and noted that the screws in Plaintiff's right leg may need to be

27   removed.  Id.  Dr. Neubarth observed that, "XR shows no evidence of osteomyelitis."  Declaration

28   of James Walter, Ex. C, p.218.  Dr. Neubarth's notes in May 1999 indicate that a transfer to the

California Men's Colony was pending. James Walter, Ex. A, p.3. Dr. Neubarth states that in 1999, he agreed with other PVSP physicians that Plaintiff's injuries would be better cared for at the CMC, where plaintiff was previously incarcerated and where Dr. Harway, a doctor with expertise in orthopaedics was employed. Declaration of J. Neubarth, ¶ 6. Dr. Harway examined plaintiff via telemedicine and recommended transfer to CMC, which Dr. Neubarth supported. *Id.* Dr. Neubarth cannot recall why plaintiff was not transferred to CMC. Declaration of J. Neubarth, ¶ 7. Plaintiff's medical records indicate that in November 1999 and throughout 2000, Dr. Neubarth repeatedly wrote prescriptions for medication for pain and possible infection. Exhibit "A," p. 4-12. Dr. Neubarth states that he wrote prescriptions for medication when deemed medically necessary for Plaintiff. UF 6. Dr. Neubarth also wrote chronos for Plaintiff to ensure he could receive a lower bunk assignment, a cane and a knee brace. *Id.* Dr. Neubarth ensured that Plaintiff's wound was properly drained each time Plaintiff presented to him and he issued a "ducat" to Plaintiff in December 2000 so that he could have a carbuncle that developed on his right tibia lanced by Dr. Huang. *Id.*

Dr. Neubarth also supported the decision to refer plaintiff to Dr. Maloney, who performed surgery on March 14, 2001 to remove one of the two screws that were embedded in Plaintiff's knee. Declaration of J. Neubarth, ¶ 7. Following surgery, Plaintiff was returned to PVSP and Dr. Maloney's recommendations for treatment were followed, including his recommendations for pain medications and antibiotics. Declaration of J. Neubarth, ¶ 8. Dr. Neubarth also referred Plaintiff for physical therapy. *Id.*

When Plaintiff's complaints of pain in his right knee continued though 2002, Dr. Neubarth referred him to a sports medicine specialist, Dr. Jeffrey Tanji. Declaration of J. Neubarth, ¶ 9. Dr. Tanji examined plaintiff through a telemedicine interview on June 28, 2002 and diagnosed Plaintiff as suffering from tendinitis or osteoarthritis. *Id.* Dr. Tanji did not recommend removal of the remaining screw in Plaintiff's right knee. *Id.* Dr. Neubarth followed Dr. Tanji's recommendations for simple analgesics for Plaintiff's pain. *Id.*

On March 28, 2003 and April 14, 2003, Plaintiff refused non-steroidal anti-inflammatory medications that Dr. Neubarth prescribed and Plaintiff demanded medications such as Celebrex, antibiotics and narcotic pain medications. Declaration of J. Neubarth, ¶ 10. Dr. Neubarth denied

Plaintiff's requests because, in his medical opinion, such medications would not have improved Plaintiff's condition.

Dr. Neubarth was last involved with Plaintiff's care on December 4, 2003 when he approved the use of a knee brace for him.  Declaration of J. Neubarth, ¶ 11.

The Court finds that Defendant Neubarth has met his initial burden of informing the Court of the basis for his motion, and identifying those portions of the record which he believes demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist.  See  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).

In opposition to the motion, Plaintiff contends that when he first arrived at PVSP he began filling out requests for health services.  David Maddox Declaration in Support of Opposition ("Maddox Declaration"), p. 2.  Plaintiff contends that he was required to wait two weeks to be seen by a doctor.  Id.  Plaintiff contends that "Defendants" gave him medication for 30 days but since he was required to take two doses a day, the medication ran out in 15 days.  Id.  Plaintiff contends Defendants would not give Plaintiff an appointment to refill his medication.  Id.  Plaintiff contends that during 1999, he developed an infection and that he would run out of his pain medication.  Plaintiff alleges that on June 28, 1999, he received a 30 day supply of pain medication even though Drs. Huang and Neubarth knew he needed to be admitted to the hospital.  Maddox Declaration, p.3.  Plaintiff alleges that his infection developed into Osteomyelitis while under the care of Defendants.  Id.  Plaintiff argues that Defendants delayed his transfer to CMC and as a result, he suffered fevers, swelling and pain.  Maddox Declaration, p. 4.  Plaintiff contends that Defendants ignored his condition and that he needed medical attention which caused his condition to become worse.  Id.  Plaintiff contends he finally received the much needed surgery in March 2001, which had to be

9

1  performed on an emergency basis due to the complications caused by Defendants' delay.  Maddox

2  Declaration, p. 6.

3       Plaintiff contends that after his surgery, Defendants continued to deny him pain medication

4  despite the knowledge that only one of the screws had been removed from his knee.  Maddox

5  Declaration, p.7.  Plaintiff contends he finally received "the rest of his surgery" on May 3, 2007.  *Id.*

6       Other than his own lay opinion, Plaintiff has not submitted any admissible evidence that

7  Defendants ignored or delayed necessary medical treatment or that Dr. Neubarth's treatment of

8  Plaintiff constituted deliberate indifference to his serious medical needs.  Plaintiff submits his own

9  opinion about the care he received and the care he should have received.  However, "[a] difference

10 of opinion between a prisoner-patient and prison medical authorities regarding treatment does not

11 give rise to a s 1983 claim."  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal

12 citation omitted).  To prevail, Plaintiff "must show that the course of treatment the doctors chose was

13 medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious

14 disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

15 1986) (internal citations omitted).

16      Thus, Plaintiff's mere disagreement with the course of treatment is not sufficient to give rise

17 to a constitutional claim.  Defendants submit evidence that plaintiff was given treatment and care

18 for his condition from the time he arrived at PVSP.  While the care plaintiff received may not have

19 been optimal, the Constitution does not require that prisoners receive optimal care, only that doctors

20 and health care staff do not act in conscious disregard of an excessive risk to plaintiff's health.

21 Plaintiff's medical record demonstrates that Dr. Neubarth saw Plaintiff at least four times in 1999

22 and four times in 2000.  In December 2000, Dr. Neubarth referred Plaintiff to Dr. Huang to lance a

23 carbuncle on Plaintiff's knee; and in March 2001, he referred Plaintiff for surgery.  In addition, the

24 treatment notes indicate that on each of these visits, Dr. Neubarth prescribed medication.  Plaintiff's

25 condition appears to have worsened while under Dr. Neubarth's care; however Plaintiff has not

26 demonstrated that his care was medically unacceptable or that Dr. Neubarth chose this course in

27 conscious disregard of an excessive risk to plaintiff's health.  Plaintiff has not submitted any

28 evidence to suggest that Dr. Neubarth ignored the recommendations of other health care providers

10

1   or failed to respond to Plaintiff's condition.  Accordingly, Dr. Neubarth is entitled to summary

2   adjudication on Plaintiff's claim against him.

3              2.      Claim Against Dr. Huang

4         Plaintiff's second amended Complaint does not include allegations specific to Dr. Huang;

5   however Plaintiff alleges generally that Dr. Huang, like Dr. Neubarth failed to provide proper

6   treatment for him.  Second Amended Complaint, p.3.

7         Dr. Huang argues that he is entitled to summary adjudication of the claims against him

8   because at all times, he provided appropriate care for Plaintiff.  Dr. Huang submits evidence that he

9   first examined Plaintiff in April 1999, when he ordered x-rays and a skin culture of Plaintiff's right

10  knee.  UF 12.  In a radiology report dated April 20, 1999, ordered by Dr. Huang, Dr. Peterson

11  observes "[h]ealed traumatic injury to the proximal right tibia with presence of two metallic screws

12  in this area.  There is no radiographic evidence of osteomyelitis."  Declaration of James Walter,

13  Exhibit C, p. 129.

14        Dr. Huang saw Plaintiff on five occasions between April 15, 1999 and January 13, 2000,

15  prescribing medications such as Robaxin, Ibuprofen, Acetaminophen and Dicloxacillin.  Declaration

16  of Dr. Huang, ¶ 6;  Declaration of James Walter, Exhibit B, p. 3 - 6.  During this time period, Dr.

17  Huang also ordered skin cultures and x-rays on two occasions.  *Id.*

18        Dr. Huang examined Plaintiff again on January 3, 2001; he also ordered an x-ray and skin

19  culture and prescribed the same medications he had previously found to be effective.  Declaration

20  of Dr. Huang, ¶ 7.

21        Plaintiff did not return to Dr. Huang's care until March 14, 2001, when Dr. Huang provided

22  Plaintiff's post-surgical care.  UF 16.  Following plaintiff's surgery, Dr. Huang examined him and

23  admitted him to the CTC facility (essentially intensive care), keeping him out of the general prison

24  population until March 16, 2001.  UF 17.  When Plaintiff returned to the general population, Dr.

25  Huang issued chronos to him for the use of a cane and a lower bunk assignment.  *Id.*  Dr. Huang

26  examined plaintiff on nine (9) occasions after his surgery and he removed Plaintiff's sutures on

27  March 28, 2001.  UF 18.  As part of his post-operative care, Dr. Huang prescribed Robaxin, a

28  narcotic, for the acute pain Plaintiff suffered immediately following surgery; Tylenol #3; and

1  Ibuprofen. *Id*. Dr. Huang also changed Plaintiff's dressing when necessary following surgery. *Id.*

2  As of May 18, 2001, Plaintiff's surgical scars were healed and there was no evidence that the screw

3  remaining in Plaintiff's knee was protruding. UF 19.  Dr. Huang discharged Plaintiff from further

4  care at this time. *Id.*

5        Dr. Huang examined Plaintiff on June 12, 2001, noting that Plaintiff's scar was healed,

6  Plaintiff was not experiencing any swelling and his injury appeared to be healing as expected.   UF

7  20.  Plaintiff was still experiencing pain, which Dr. Huang did not find uncommon only three after

8  surgery.  Declaration of Dr. Huang, ¶ 9.

9        Plaintiff's medical record reveals that he was also treated for his pain and knee injury by

10  other physicians at PVSP during the relevant time period.  UF 21.

11        Defendants have submitted evidence that Dr. Huang treated Plaintiff both prior to and after

12  his surgery, providing medications, ordering x-rays, skin cultures and attempting to relieve Plaintiff's

13  pain. *See* Declaration of Dr. Huang, ¶ 10.  Dr. Huang maintains that he used his best professional

14  judgment to care for Plaintiff's injuries. *Id.*  Other than his own lay opinion, Plaintiff has failed to

15  produce any evidence in support of his claim that Dr. Huang failed to provide proper treatment to

16  him or that he was deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff has

17  submitted no admissible evidence bringing any material facts into dispute.  Accordingly, Dr. Huang

18  is also entitled to summary adjudication on the claim against him.

19                    3.    Claim Against Defendant Warden Lewis

20        Plaintiff alleges that his mother and sister contacted Warden Lewis by telephone and

21  complained to him about the medical care plaintiff was receiving but Lewis failed to intervene.

22  Amended Complaint, p.5-6.  Plaintiff also alleges that he informed defendant Lewis of his serious

23  medical needs and that Lewis failed to train, hire, discipline and/or teach medical professionals at

24  the prison in a manner that did not violate his constitutional rights.

25        Defendant Lewis argues that he is entitled to summary adjudication on Plaintiff's claim

26  because she has no recollection of any conversations with Plaintiff's family members and Plaintiff's

27  characterization of the conversations are inadmissible.  Defendant Lewis also argues that Plaintiff

28  fails to elaborate on how he informed Lewis of his medical condition and Plaintiff cannot provide

dates, witnesses or details. Defendant Lewis maintains that he is not responsible for medical care at the prison. UF 2.

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). A prisoner's claim of inadequate medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)). A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

Plaintiff alleges that he and/or his family informed defendant Lewis about his medical condition and complained about his treatment. Lewis maintains that she has no recollection of these conversations. Thus, there is a disputed issue of material fact regarding Lewis' knowledge of Plaintiff's serious medical needs. However, even if Lewis was aware of Plaintiff's serious medical needs, as discussed in detail above, there is no evidence that the care Plaintiff was receiving from Defendants, or anyone else, was constitutionally deficient. The record is utterly devoid of any competent evidence that Defendant Lewis "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety." Farmer, 511 U.S. at 837. Plaintiff's conclusory statement that Defendant Lewis "knew of" Plaintiff's condition, without more is simply insufficient at this stage of the proceedings. Accordingly, Defendant Lewis is entitled to judgment as a matter of law on

1   Plaintiff's claim against him.

2        E.     Conclusion

3        For the foregoing reasons, the Court finds that Plaintiff has not met his burden of setting forth

4   admissible evidence raising triable issues of material fact, and Defendants are entitled to judgment

5   as a matter of law on the claims against them.  Accordingly, based on the foregoing, it is HEREBY

6   ORDERED that:

7        1.     Defendants' motion for summary judgment, filed March 20, 2008 is GRANTED,

8               thus concluding this action in its entirety; and

9        2.     The Clerk of the Court shall enter judgment for Defendants and against Plaintiff.

10

11   IT IS SO ORDERED.

12   **Dated:   October 9, 2008**               _____ **/s/ Dennis L. Beck**_____
                                                 UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28